Our final case is 24-1450, Brainchild Surgical Devices, LLC v. CPA Global Limited. Mr. Abbott. Thank you, Your Honor. May it please the Court, my name is Ryan Abbott, and I represent Appellant Brainchild Surgical Devices. This is a relatively straightforward case about a vendor systematically overcharging, and the issues before this Court are straightforward ones about contract interpretation as well as expert exclusion and disqualification. The case is a putative class action filed against CPA, which provides patent renewal services. When you own a patent, you have to periodically pay fees to patent offices around the world to keep it in force in any jurisdiction you hold the patent. CPA, like many competitors, provides this service. Clients have a renewal services agreement when they sign up, and then Brainchild periodically sends out renewal notices with terms and conditions that supersede those of the renewal services agreement. Per its contract, CPA charges under a very standard structure for service providers. There's a service fee per renewal. This is a clear, transparent, repeatedly disclosed charge. Brainchild paid $200 per renewal, and that's a concept any reasonable client could understand. CPA performs a service charge as a service fee. There's overhead in there. There's profit in there. That breakdown is CPA's business. If $200 was too much, Brainchild could have shopped around for lower service fees. But then there were charges, and the first charge is an official charge. This is a pass-through charge, and it's what CPA actually pays a patent office on behalf of a client. So when Brainchild had CPA renew its U.S. patents, CPA pays the patent office its fee. Then they tack on $200, and that's it. And the U.S. is a direct-pay jurisdiction, which means that my friend or I could write now or after court, go on our phones, go to the patent office website, and make a payment for Brainchild's patents. Anyone can pay directly to renew these patents. But that's not how CPA charged U.S. clients in foreign jurisdictions. They tacked on two additional charges which contained massive overcharges, country charges and funds management charges. In the renewal services agreement, country charges are not described. You get the service fee, you get charges, you get your pass-through official charge, and then it says, and a country charge available by a tariff on request. A, the evidence showed that they did everything they could to avoid providing this tariff, and B, there isn't a standardized tariff. I'm sorry. What does that mean, they did everything they could to avoid providing the tariff? Well, as one of their ex-executives testified, as the documents reflect, if a client asked for a tariff, CPA would try not to provide it. They had a whole kind of dog and pony show they would provide to try and come up with an excuse for not providing this document. The document didn't, in fact, exist. There's no standardized tariff. It was a document made by CPA on a case-by-case basis for each different client if they couldn't deflect inquiries about it. So there was no standard country charge. When you say tariff, I mean, we got two sets of terms and conditions, right? We got the one that came with a general agreement, and then we got the one that is even harder to read from the renewal notices, I think. And so in terms of the country charge, the language is different. Yes. And I don't hear you arguing that the 5.3 from the renewals is not binding. First of all, as a matter of contract, what contract terms we're dealing with, do you agree that your argument depends on 5.3 of the renewal terms and conditions? Yes. Okay. And that language isn't talking about tariffs? No. So that uses a little different language. The CPA focuses on the renewal services language agreement, and it just says tariff, which has meaning, which implies a very standardized sort of thing like a tax or a duty or something like a patent office charge. In the renewal notices, it says this charge relates to the infrastructure, CPA global personnel, and third parties required to renew in a particular jurisdiction. So these are required charges. Well, required charges modified by relates to. Right. You're trying to say, as I understand it, relates to equals pass-through. That is one of our arguments, yes. What relates to is based on this cost. Either passing through this cost based on the language and structure of these provisions or at least tethered to these costs. In the alternate, if CPA is allowed to tack on some sort of profit margin or have a customary or industry charge associated with it, it didn't do that either. Why couldn't, I mean, seems to me relates to is just linguistically very different than pass-through. I think because of the overall structure and language of this agreement. When you say you have a service fee, someone understands, a reasonable client understands that that is a profit center. And when you then say now we have charges, the first one is a pass-through charge, the next one relates to these components, that a reasonable understanding is you are passing through those costs. Why wouldn't you think the exact opposite? When 5.2 says the amount we pay, I get you that you may, I agree with you that it's reasonable from that to say that's a pass-through. When the next paragraph doesn't use that language but uses different language, why wouldn't you expect it to be something different? Well, I think, again, because of the structure and the placement and the underlying context of the Removal Services Agreements also, that you have clear language distinguishing a profit center as a service fee that is a competitive service that people can shop around for, and then you have buckets of charges that are based on things that are costs to CPA. What if we disagree? Let's say we disagree on the pass-through argument. Fair enough. Well, then I think we still win, and at least CPA's motion for summary judgment should be overturned. Because even if it relates to, that basically means, all right, we have a cost and it relates to that cost, and maybe we get to upcharge the cost, right? There's like an incidental profit or a reasonable or a customary or an industry profit. But all the evidence from extensive discovery was that CPA claimed not to know their cost of infrastructure in a particular jurisdiction or of CPA global personnel. They had every opportunity to even estimate these costs and claimed they could not do so. Let me break it down. First of all, you said, well, maybe they can have an industry or a reasonable upcharge or something. Why can't they have an unreasonable upcharge? If it relates to, let's say we want to upcharge it 1,000%. As they did. Okay. If I was them, I'd say that relates to, it's 1,000% multiple. Why isn't that related to? Because for two reasons, Your Honor. First, I would say on the plain language of this contract, there is no indication to a reasonable client that this is a profit center or a profit center that exceeds the amount they're charging in service fees. But even if this court thought that this granted carte blanche to CPA to charge whatever they wanted here, that is when the implied covenant of good faith and fair dealing would come into play, where it would be unfair and unreasonable for them to charge an arbitrary amount that is entirely untethered to cost. It seems to me this is the typically implied covenant of good faith and fair dealing would not impose something that is permitted under the written agreement. So that, and if the argument is relates to is broad enough to include an upcharge, it seems to me your use of implied covenant of good faith is being done in a way that's contrary to the agreement. It seems to me what you have to argue is you've got 5.3 says relates to, and then you've got to say what must it relate to. And it must relate, I think you would say, to infrastructure and personnel costs required for that renewal. Correct. So it seems to me your argument, the best one is, well, they can't show that these costs are related to, as broad as that is, to the required personnel and infrastructure costs. Well, that is, if Your Honor does believe that there is enough room in this language for an upcharge, even then they did not tether it in any way to the cost. Relates to has to mean something. And I don't think it can mean an unlimited amount of anything. If the cost is $1, you know, relate to couldn't mean, well, that's $1, we're going to charge $1,000. It's related by a factor of 1,000 to 1. There has to be some reasonable anchoring to the cost it relates to. Otherwise, that language is superfluous. What they really want the contract to say is, here's a service fee and a country fee, and per jurisdiction we're going to charge you whatever we want, and, you know, you're paying that. But that's not what the language says. The language says, even in the renewal notices, relates to these costs. Because they claim they don't know two of the costs, it is impossible for it to relate to those costs. And where there is a cost that is sometimes applicable but only in direct pay jurisdictions and not indirect pay jurisdictions, or vice versa, you know, they upcharge that by 10 or more factors. And they even charge that where there are no third parties. So where they have testified, where the evidence, undisputed evidence, is there is no attributable cost to this. They are charging more in service fees than country charges. And that, we would argue, is not allowed by that language, even under the most permissible possible construction. Is there a legal significance to the fact that, in addition to the, you know, the sort of the standard terms and conditions that were agreed upon at the outset of the relationship, that each time CPA was going to move forward with this patent renewal, it would send a quote to your client saying, here is our best estimate of the charges. You can either accept or deny. Why isn't that a separate or rejected? Why isn't that a separate agreement that your client was then free to accept or reject? Well, the renewal notices stated that they superseded the terms of the renewal services agreement. The estimates were just estimates they were providing the client. And these could and did change a little bit as currencies fluctuate or as office, as local agent fees change, or as patent offices change their rates. But all this said was, okay, to renew in Europe, it's going to cost $1,000, right? For other clients, it did say country and funds management charges, but it didn't break these down. You know, Brainchild had no way of looking at that from the face of it, that they were being charged in a manner inconsistent with these agreements. So the fact that they just said, here's a charge, pay it or don't, doesn't mean that they've adhered to the structure they agreed to in either the renewal services agreement or the renewals notice. I mean, it would be like saying, here's a charge, sales tax, fuel surcharge, port charges, right? And someone just pays the invoice assuming it is above board without reverse engineering it. Someone has to reverse engineer these to figure out, to try and figure out how they're being charged. And that happens sometimes, and CPA calls it a price discovery event. And if even CPA, one of the remarkable things about this case, the record, and the district court judgment is it did not engage with the mountains of party admissions we found that even CPA understood it was charging inconsistently with its own contracts. They had a whole PowerPoint for their sales and client relationship staff to explain, in the event we have a price discovery event, a person figures out how we're charging them, how to deal with that. And I would submit first, if they actually believed that the contracts allowed them to charge us, there would be no such thing as a price discovery event because clients would know how they were charged. And second, the answer would be, look at the contract right here. It says we can charge that way. What the PowerPoint says is, when they feel we've been dishonest, here's a whole bunch of stuff you can say, but at the end of the day, there's no real defense to this. Give them to us, and we'll try and do a deal with them so they don't leave. And I would submit the way CPA charges is inconsistent with the plain language of the contract and with the implied covenant of good faith and fair dealing. Do you have a fraud claim? We had a fraud claim that was dismissed because at the time we brought it, we did not adequately particularize what representation. Is that before us? Whether we deserved a second leave to amend, yes. But that's a procedural issue kind of unrelated to this. I mean, the relevance, because there isn't a fraud claim at the moment, of the fact that CPA thought it wasn't allowed to do this is just that the court doesn't have to wonder what a reasonable client might have interpreted this contract to mean. You have contemporaneous records from CPA itself from their highest level people looking at this and saying, well, we're not allowed to do this, but we're doing it, and here's how we can try and get away with it. I see I've run out of time. I could continue with some rebuttal time. You've got some time left for rebuttal. Thank you, Mr. Adams. Thank you. Mr. Adams. Thank you, Your Honor, and may it please the Court, William Adams for CPA Global. As we've just heard, Brainchild's theory of this case is that it was overcharged for patent renewal services because it did not realize the extent to which it was contributing to CPA's profits and not just recovery of CPA's costs. But as the district court correctly ruled, whether Brainchild was overcharged here depends on the terms of the contract. This is a breach of contract case, after all, and there's absolutely nothing in the text of the agreements here that limits the charges at issue to pass-through costs, nor is there any evidence in the record that the charges aren't permitted by the terms of the contract. Do you agree that the country charge, you can under the country charge category in 5.3 of the renewal terms and conditions, the charges there must relate to the infrastructure and personnel costs required for a particular renewal? No, Your Honor. There is a textual elimination on relates to, but that textual limitation is not connected to a particular renewal. So the provision says a country charge, quote, relates to the infrastructure, CPA personnel, and third parties required in order to execute a renewal in a particular jurisdiction. It's a limitation, but it's not tied to the particular renewal. And we know that, and that's a matter of how CPA conducts its business. It does not. We don't need to talk about how CPA does its business. We need to talk about what the text says. Yes, Your Honor. And it says, I don't know, I mean, if I'm reading it wrong, what's your argument that relates to, doesn't modify the language beginning with the infrastructure and ending with in a particular jurisdiction? I agree, Your Honor, that it modifies that language. I do not disagree. What that language does not, though, is tether the charge or create a limitation to the costs associated with a particular renewal. So renewals are a volume business, and so CPA aggregates its costs across its portfolio of renewals for a particular jurisdiction. So my friend on the other side is absolutely correct that we don't know the cost that's associated with a particular renewal. That's just impractical to know, and that testimony is undisputed. It's impractical. Why did you have agreement that says it's going to relate to the charges required for a particular renewal? It seems to me, you know, just to take an example, you have a renewal in Tokyo, and there's costs associated with the people who do that. And I think your headquarters is in Jersey Island. And is that, I mean, I'm sure there's some headquarters, you know, infrastructure and personnel costs that go along with it. But if instead of looking to the costs that are required for the particular renewal and then charging something related to that, it sounds like you're saying, yeah, we don't do that. We look at all our costs, whether we've got things going on in L.A., those costs don't have anything to do with what we're talking about in Tokyo, but we still lump them in there because it would be impractical not to. That's what the record reflects, Your Honor, and there's nothing in the text of the agreement that required us to do otherwise. I should take you, if I could take you, we've been talking about Section 5.3 of the renewals. But if you look back to Section 5.3 of the original agreement, this is a JA-318, and this is the first reference to the country charge. And it says Brainchild must pay, quote, where applicable, a country charge which is set out in a tariff which may vary from time to time, a current copy of which is available upon request. A tariff is simply a schedule of rates or charges. It's not limited to, and if there is a schedule, it's not going to be renewal by renewal basis. It exists independent of the particular renewal that is at issue. And so then you have that provision, you read it in context with the Section 5.3, which Your Honor and I have been discussing, and there's nothing in there that connects the charge to this particular renewal. And that's exactly what it's very clear from the record that that's how CPA's business operates. How could it be more clear? You say it's not connected, but how could it be more connected than to say relates to the infrastructure, CPA, global personnel, and third parties required in order to execute a renewal in a particular jurisdiction? I don't get your argument. It sounds to me like your argument is we just need to ignore that because it's impractical. Not at all, Your Honor. Not at all, Your Honor. I mean, my argument is you look at the text. There's nothing that connects it to the particular renewal that is at issue. It is an aggregation of charges that are related to the infrastructure, CPA personnel, and third parties. And there's no evidence in the record that suggests that any charge was unrelated to the infrastructure, CPA personnel, and third parties. I direct Your Honor, I mean, to the testimony is unequivocal here, both that my friend relies on as to how the charge in practice is implemented. If you look at between JA. Before you leave the text, because I'm still not understanding, what's your – can you tell me what required in order to execute a renewal in a particular jurisdiction means? It is costs that are associated with procuring a renewal in a particular jurisdiction. Okay. So what's the role of that in determining the official, the country charge? That is the components, input to the country charge. Not limited, again, to the certain costs, but they need to be – I agree that there needs to be a relationship between the country charge and those components that are there, related infrastructure, CPA personnel, and third parties. And there's no evidence in the record, again, that there's anything that – But you don't think – you don't think the charge must relate to infrastructure and personnel required for a particular renewal? I agree, Your Honor. And I should – that's right. No, I do not think it does. And I should take you back to, you know, earlier in your colloquy with my friend on the other side, you pointed to the official charge in Section 5.2. And where the parties knew how to limit costs to particular costs associated with the transaction, they did so. So at JA 324, he says there's the official charge. You shall also pay an official charge which represents the amount we pay to relevant registries in each jurisdiction. That is a different language, of course, than the language we're looking at at 5.3, which is not tied to – which is not tied to pass-through costs and is not tied to a particular – to particular transactions. Now, I think my friend on the other side also has emphasized good faith and fair dealing claim. But actually, before I get there, I would like to talk a little bit more about the evidence. Their alternative argument is, if you don't agree with them on the text of the agreement, their alternative argument is that there's still evidence in the record that would suggest that there are charges that are unrelated to what's permitted by the country charge or that there are charges that are not permitted by the funds management charge. But the record is absolutely clear that despite massive amounts of discovery, as you know, the joint appendix is quite large, is that there is no evidence in the record of any charge that is not connected to the terms of the contract. The district court found that. It depends on what the contract says. Is it – I think it's fair to say – I think I would agree with you if 5.3 that we've been talking about in the renewal notice, if the charges only must relate to any infrastructure and any personnel, that you're right, that the record would support you did that. But if the language beginning with required means that you must – the charges must relate to those required for the transaction, then the COO's testimony suggests you can't even do that. You're correct. Everything comes down to whether you get to charge country charges as long as they're relating to any personnel or any infrastructure, or whether you can only charge things that relate to infrastructure and personnel required for a particular renewal. That's where this all comes from. That's correct, Your Honor. But I'll also give you – obviously we want to focus on the text here. I want to give you another textual basis on which you confirm, and Chief Judge Diaz hit on it at the end of my friend's argument on the other side. If you look at Section – so it's in JA 318, and it's going to be a combination of Sections 5.3 and 5.7. So 318? 318, which is the original renewal services agreement. Section 5.7, I can just take you there. Okay. It begins that we shall give you our best estimate of the total aggregate charges in each renewal notice, which there's no dispute is what happened here, which we send you in relation to the services. If by the relevant deadline we have instructions to proceed with a renewal, we shall be entitled to submit an invoice for, and you shall pay such charges as shown in the renewal notice in respect of the services. So Brainchild, like all of CPA's clients, had an opportunity, received a renewal notice that specified an aggregate charges – estimated charges, received that charge, had an opportunity to inquire about it, to ask for a breakdown of the cost. It didn't make any inquiry here. It didn't make any breakdown of the cost. It authorized the patent renewal service to go forward, and then it was obligated under 5.7 to pay the estimated charges that were provided. So are you saying that provision would allow you – I know you disagree that you breached 5.3, but if it's read the way that it's limited to the required services for a particular renewal, are you saying that 5.7 allows you to violate the terms of the agreement, and because they had a chance to dig into it, they can't bring an action? It doesn't allow us to violate the terms of the agreement, but if there is basically a challenge to whether our charges are permissible under the agreement, they should raise that challenge before they tell us to go ahead and provide the services of which they're billing them for. They're basically saying, all right, here, we know how much you're going to charge us. We put it out in the renewal notice. It's, you know, clear. It's in black and white. And then we go ahead, provide the renewal services as specified in the renewal notice. Then they come back and are objecting to the charges all of a sudden. They were on notice of the charges. They had the opportunity to contest them. It was clear. And so I think that you read that. It's not a license, of course, to disregard other provisions of the agreement, but it was their opportunity and their obligation, I think, to put forward their challenge, if they had one, to the charges then as opposed to sort of waiting, lying in wait, having us do the services and then come back and then challenging that. So that's under 5.2. So there's sort of two principle textual arguments. One is under 5.7, which I just conveyed to you, and the other is under 5.3, that the relation to argument is simply not tied to any particular renewal, and it would be impractical to do so. Can I ask you about that? Yes. It doesn't say a particular renewal. It says a particular jurisdiction. What's your position on whether this 5.3 means it must relate to these various costs and profits for a particular jurisdiction? That's right, Your Honor. I think that it does need to relate to the costs associated with aggregate costs. Is that how it is done? There was an interchange a moment ago about as though it was aggregated across every place in the world and then just divvied up among clients. But is that the evidence, or is the evidence that it was aggregated per jurisdiction? Is it aggregated? I'm not sure what the record is on that. I'm not aware of any evidence in the record that suggests that there was a breach under either vision or either interpretation of the contract. My understanding is that there's an aggregation of costs. I think, I mean, I can check, Your Honor, if that would be helpful afterwards. But my understanding is there's an aggregation of costs, at least on a country-by-country basis, but I would need to confirm with my colleague to be sure. I don't recall COO Sampson saying they were aggregated only by jurisdiction. Okay. I may be wrong. You know the record better than me. I thought he said we're aggregating costs, and I thought that was your argument, that we get to aggregate costs everywhere and they just must relate. Well, I think that, I think that, I think, Your Honor, on Mr. Sampson's testimony of 1424, thank you for refreshing my recollection. He does talk about aggregating on a country, on a company-wide basis. And so I think that the text of the revision, back to Judge Rushing's question, says that charges must relate to the infrastructure, CPA personnel, and third parties where appropriate required in order to execute a renewal in a particular jurisdiction. There's nothing, though, in that language that limits it, again, to that particular renewal. So I think that is the ultimate issue. Can I ask a question about the argument you made as a follow-on to the point I made with your friend on the other side about the separate quote that acts, I think, in your view, as a separate agreement, wherein they had a chance to review the charges and they decided to go forward. So I'm trying to, having said that, I'm just trying to figure out what the legal principle is that we would say in an opinion. What is it, latches, estoppel, ratification? I mean, what is it that somehow supports that argument, that notwithstanding the terms and conditions that were set out at the beginning of the relationship that afford to limit the charges in a way that I know you disagree with the way Judge Quattlebaum characterized it, but let's say we agree with him and there was a breach of those terms. How does the quote, what does the quote do to sort of solve that problem for you? Right. Well, Your Honor, I don't think you need to resort to any sort of, I guess, equitable type document to do this. I think it's still consistent with contract law. And on page JA-324, Section 1.1 says, These conditions shall govern and be incorporated into the contract made by CPA Global or on our behalf with customers for the administration of intellectual property rights. And so that term in Section 5.3, Section 5.7, excuse me, Your Honor, is incorporated into their relationship and becomes part of their contractual relationship. And it says that we will, and there's actually a flow chart a few pages before which explains sort of the steps that the parties go through in implementing their relationship. And 5.7 is incorporated into it. It says that there's an opportunity for us to provide estimated charges. We don't have to give them any breakdown. It's an aggregate amount, and you have an opportunity to review those and then decide whether to authorize or proceed with the renewals. And that is just an independent ground for saying that there was no breach here because once we comply with that obligation, they didn't take it upon themselves to ask for any breakdown. Many clients do. Many clients negotiate these rates. That's clear from the record as well. They had a completely laissez-faire approach to the agreement here and to the relationship. And once they failed to take advantage of any sort of paths of inquiry with respect to the estimated charges, under 5.7, they were no longer able to contest the charges. It says at the bottom of that paragraph in language that I didn't read, it says once we have issued an invoice for charges, we shall have no obligation to refund any such charges under any circumstances to you. They were on notice that they would receive an invoice, a renewal notice with estimated charges, if they had an opportunity to review that invoice, to authorize or to not authorize the renewal services, and if they opted to proceed with the renewals, then they were obligated to pay for the charges that were specified in the invoice. They obviously had the opportunity to walk away if they wanted to. They could decline to renew the patent. They could abandon it and go to a competitor. They ultimately went to a competitor. They picked up the phone. They said, I'm not happy with the rates that I'm – with the charges that I'm paying. I want to go somewhere else. And that was perfectly – they were perfectly entitled to do that. And as we know, under the voluntary payment doctrine argument, they certainly knew of their argument and their objection to overcharges before they made even that final payment. But for each of these sort of – each of these contractual textual bases, their argument – the district court was correct to conclude that their argument failed as a matter of law. I do think that, you know, they argue about how it was difficult. It was opaque. It was difficult for them to determine the scope of the charges. But as the district court found, they received all of the information that they needed – all the information that they were required to under the contract. You can't import from the good faith and fair dealing or any other principle an obligation to disclose that's not present in the terms of the contract. The implied covenant is not intended to rewrite, to broaden obligations, and that's exactly what they're seeking to do here. My final – my final – I have a question about the voluntary payment doctrine, which I think I – I think I agree with the district court on that point. But wouldn't the inverse be true if the client didn't know about the illegality of the payments or the breach, whatever you want to call it, that it seems to suggest that the voluntary payment doctrine would not apply, meaning that all the payments that were made previous to that last one were made without full knowledge of what your client was doing and, therefore, there's a breach? The record doesn't reflect when they gained that – when they gained that knowledge. We just know – may I say something? Yeah, go ahead. The record doesn't reflect when they gained their knowledge of the overcharge. We just know that it's undisputed by the time of the final payment that they had that knowledge. Of course, parties are presumed to know the terms and understand the terms of the contract. It was very clear, you know, their obligations to pay, certainly upon receipt of the estimated charges. All right. Thank you very much.  Senator? Respectfully, I would submit that my friend here made a concession that explains why their case fails here. He acknowledged, as the language demands acknowledgment, that 5.3 means there has to, at a minimum, be a relationship between these enumerated costs and what a client is being charged. The undisputed facts of this case was CPA did not know these costs and claimed not to track them, not on a renewal level, not on a client level, not on an aggregate level. My colleague and friend, Mr. Alvin, and I were both there with Mr. Sampson. I asked all of CPA's executives this in deposition. None of them could even estimate these amounts. It is legally impossible for something to relate to a cost if CPA claims not to know the cost of it. And with respect to estimates coming in, this is why the opacity is relevant. So it says $1,000 to pay in Europe and a client says fine, but they're expecting that $200 is the service fee and the rest is cost that they're just going to have to pay. And if they call up a competitor and they say, well, we've got a $300 service charge, they say, well, then I'm better off with CPA. But if CPA was saying, well, it costs two cents for us to convert currency and there's a $300 funds management charge, so really you're paying us $500, they wouldn't be competitive anymore. So the fact that they sent an estimate with an aggregate chart that on its face looked okay isn't evidence that Brainchild was agreeing to charges that weren't set out in this contract. Contrary to what my friend said, it is not disputed, it is disputed that Brainchild had knowledge for the final payment doctrine. The client testified he didn't know when exactly he gained this knowledge. The burden is on them to show this. The evidence is that shortly after switching providers they filed suit against CPA, but that did not show undisputedly the evidence was in there before then. Counsel, can I ask about a topic that we haven't covered yet and it relates to the expert rulings? Yes. It seems to me that from reading the disclosures that the testimony that you sought to elicit from these experts was basically that these depended on the interpretation of the agreement. In other words, if Cass was saying they were overcharged, they're only overcharged based on what the agreement meant or didn't mean. And so the first step, it seems like in both experts' opinions, to be admissible or to be probative would be what does the contract mean? Well, so both of these experts had a lot of different things they were saying. They had many different opinions on different features. But on the opinion about overcharging, part of it depends on what the contract says. Does the contract say CPA can charge whatever they want, that they can only charge a pass-through cost here, or can they charge a reasonable or customary profit? Right. In the event that this Court decides as a matter of law, well, the contract is ambiguous, then it needs to go to a jury. If more than one of these options, if more than CPA's option is true, it has to go to a jury. But if the Court says as a matter of law or a jury decides, you get to charge a reasonable customary funds management charge. Let me stop you because, I mean, there could be – I mean, sure, we could say it's an ambiguous contract and then we look at extrinsic evidence of the intent. But we also could say it's unambiguous and there's a question of fact about whether these charges relate. And that doesn't – there's no – once that happens, maybe there's some forensic accounting role for experts, but there's no role for experts to say, hey, this is unreasonable because you should have charged a reasonable charge as opposed to whatever. Well, I agree with that. It does depend on how this Court decides what this language means. You know, if there is a – And they can't help us with that. That's per se the province of the Court. Well, correct. Unless the Court says what this means is CPA gets to charge a reasonable funds management charge. Why would we say that? Where in the world is that written? Well, where it says, you know, funds, you know, like country charge, you know, relates to these costs, right? One of the arguments is we can charge whatever we want. One is we can only charge pass-through costs. One is we can charge an incidental profit or a reasonable or a customary rate. No. I mean, the argument is we get to charge an amount that relates to. It can be reasonable, unreasonable. It just must relate to it. I don't see where you get to come in and say, well, it relates, but it's not reasonable. I mean, either relates or it doesn't. Well, Your Honor, so firstly I would say, A, the undisputed evidence is it doesn't relate. But, B, let's take a funds management charge where the evidence is that they pay .02 percent to exchange dollars to euros and they charge 36 percent. Now, there is a relation between those two numbers, but it is so attenuated, I would say, as to be at the least unreasonable and at most nonsensical. I mean, you could say a million dollars is related to one dollar, and it is, but that doesn't have kind of any bearing on this. There has to not only be a relationship, it has to be a reasonable relationship, or it is pointless to include tethering to a cost. Now, country and funds management charges are not unique to the patents. They are common features of international transactions. It is common, and Mr. Cass testified to this because he deals with international transactions, that you have charges associated with currency conversions called funds management charges, including other costs and risks associated with currency conversion and country charges for jurisdictional specific charges. Now, he testified he sees those in contracts a lot, and CPA's attorney argument was that this is bespoke to the patent context and only a patent expert could opine on this. But there was sworn deposition testimony that he was an expert in these concepts and attorney argument that only someone with a patent industry background could testify about it. So if the court says, all right, well, it has to relate, it doesn't have to be pass-through, there still have to be limitations, either under the implied covenant or on the contract language, there has to be a reasonable relationship, too. And this is something that is industry custom and reasonable and which we did have expert testimony on. And so in the event the court found that, you know, Cass and Kehoe were both talking about what these sorts of costs might be and what might be a reasonable amount for them. You know, the other evidence of reasonableness is, indeed, kind of what clients contemporaneously did, what Brainchild's understanding was, and what potentially other class reps or someone might do. Do you have anything else, Mr. Radovich? Thank you, Your Honor. Thank you. I want to thank both lawyers for their arguments, fine arguments, this afternoon now.
judges: Albert Diaz, A. Marvin Quattlebaum Jr., Allison J. Rushing